Good morning, Your Honors. If it pleases the Court, Gretchen Fusilier on behalf of the appellant, Mr. Ares-Garcia. We would initially indicate that on the standard of review, the government is indicating that it should be on plain error because Mr. Ares-Garcia's counsel at trial did not make an adequate objection. And I think we have adequately addressed that in our reply brief and citing the case of U.S. v. Grissom at 525 Bedford 691. There is no doubt that when the DEA special agent, Ms. Schneider, was testifying regarding the emails, which are the crux of this case, Mr. Ares-Garcia did object based on lack of foundation, opinion, and speculative. But not because it was hearsay. However, the Grissom case indicates that when the Court understands the essence of the objection, it is a qualified objection that preserves the issue for appeal. Here, in response, the trial judge said, denied, subject to it being linked up. The government's argument is that it was linked to a conspiracy. This indicates that the trial court clearly understood that there was nothing to link it to other than to a conspiracy, and that the lack of foundation went to the objection that there was not the requisite foundational information to overcome the hearsay quality of that testimony. So we do feel that there was an adequate objection made at trial. It was clearly understood by the judge at the trial, and the review should not be for plain error. Well, it seems like the Court's statement, and that was only for, I guess, Exhibit 14, not for Exhibit 12. If we determine that's somewhat ambiguous, can you argue on plain error that you would still prevail? Yes, Your Honor, we would. We would indicate that there was an error, it was plain, and the cases were clear, and they were clear at the time of trial, that in order to establish independent evidence of a conspiracy that Mr. Aras-Garcia was linked to, you have to have more than the statement itself. Here, there was nothing more. In this case- Can I ask you a question? In considering the hearsay issue, it wasn't clear to me that the e-mails were asserting anything. I mean, the e-mails just had a name on them, or two names and a number. Why did those meet the definition of a statement, an assertion, intended to be an assertion, offered to prove the truth of the matter asserted? What exactly is asserted by those e-mails? The government's position was at trial that those e-mails indicated that Mr. Aras-Garcia was, in fact, a knowing participant, consenting participant in the conspiracy to import drugs into the United States. So I see that they were evidence, or the government would have the jury construe them, but presumably the jury did construe them, as evidence of your client's involvement. But why were they an assertion? That was what was puzzling me. The assertion is that the e-mails, as Ms. Snyder testified to, provided the bank name and the bank account number that a third-party deposit would be made into after the finalization of the importation of drugs into the United States. Therefore, the assertion was that this is a party who is part of this conspiracy. Here is the information to obtain payment through at the completion of that portion of the conspiratorial event. And because that is quite, well, that was an important part of the government's case, that would be the assertion that the government relied on and that the defense objected to. Furthermore, we would indicate that when we look at Exhibit 14, if you compare it with Exhibit 9, for example, which is in our excerpts of record, you will see that in Exhibit 9, the co-conspirator's names and bank account numbers and the bank names are not separated with any kind of delineation. In Exhibit 14, in which Mr. Aras Garcia's name appears, it appears below Basuah Soto's name, where a corresponding bank account number and bank name refers to Mr. Basuah Soto. There is then a very definitive line below which appears Mr. Aras Garcia's name. We would indicate, as the cases uphold, that mere association, innocuous statements of co-conspirators would not implicate Mr. Aras Garcia in the conspiracy to import drugs. As we indicated in our brief, citing USA versus Herrera-Gonzalez, yes, Gonzalez. What's so innocuous about that? The innocuous statement or characteristic of that particular exhibit is that it's the appearance of Mr. Aras Garcia's name alone. It has no importance, as the DEA expert testified to, as the policy among drug importers and dealers. Therefore, we would argue that because the DEA went through exhaustive exercises to determine financial gain obtained by Mr. Aras Garcia, they found no bank account for him. They found, apparently, no payment or withdrawal from Mr. Basuah Soto's bank account that would answer the question, well, he was paid directly. So that was one of the things that just seemed was a troubling inconsistency, was that on the one hand, in order to say this is hearsay, you have to say it's making an assertion that he's a drug courier. But on the other hand, you want to say, but actually, it's not making any assertion at all. It's just the name, and it's innocuous, and he's just hanging out on this piece of paper with another name. So how do I reconcile those two positions that you need to take? Well, Your Honor, unfortunately, I was arguing the appeal based on the records that trial counsel created. Trial counsel essentially did not argue that it was not hearsay, but merely an innocuous statement. And in our brief, we did indicate that it was an innocuous statement that cannot rise to the level of a hearsay statement, even, to be the subject of the issue whether or not it was an exception to the hearsay rule. But because the hearsay rule in relationship to that statement or to that e-mail was asserted at trial, it was within that realm that the appellate issue was developed. Our position is that it does not rise to any kind of evidence, although it was argued by the government as evidence linking Mr. Arroz Garcia to a conspiracy. And as the Herrera-Gonzalez court acknowledged, citing the Campo case, one can perhaps be involved in an isolated criminal act. That does not elevate it to a conspiracy. So even if the, even if Mr. Arroz Garcia were involved in the importation of drugs across the Mexican border into the United States, which we are not conceding, it appears that the government, without more, would not have had sufficient basis to charge this as a conspiracy to import. Okay. You want to save a minute? We may please the court. Patrick McLaughlin, VF of the United States. You know, you look a little like Dick Cheney. I've actually had that comment before. Have you? We may look alike, but we don't. No, no, that's okay. I thought he was sitting back there watching this. I feel better. Tell us what the evidence of the conspiracy was here that the government showed and the connection of this defendant to the conspiracy. All I can see in the record is that you have the two emails and his coincidental border crossing. What else? When you consider all the evidence in this case and the similarity of the previous emails, as the court notes in the record, in December of 2006, there were emails transmitted from this co-defendant. Have you diagrammed this? I'm sorry? Have you diagrammed it, your conspiracy? I don't think I did in this trial. In this particular trial, I don't think I did a diagram. But essentially, there were two acts or two drug importations, one in December of 2006 and one the government intends in April of 2007. That's when they crossed the border. Correct. And the similarity between the acts leading up to what we know to be a seizure of heroin and cocaine in December of 2006, specifically the emails that were sent from Utrera to Menes, to Dinosaurio, identifying two couriers, Pazuasoto and Perez. And in addition to that, there were intercepted telephone calls, because they were up on a court-authorized wiretap, in which Utrera Menes is having conversations with Perez. Those events occur in December of 2006. And admittedly, at this point, we don't know anything about our associates. What did they say to each other? They were talking about how the progress of the cars going into Mexico and what was happening with the cars, and then when you were to come back to the United States, how you should return to the United States. It was encrypted, coded language, but it was clear, according to Agent Schneider's testimony as an expert, that in fact, they were in communication about the drugs that they were to pick up from Dinosaurio. This case essentially was Utrera Menes is the person in California responsible for sending couriers into Mexico. Dinosaurio was a person in Mexico, or even south of there, who was responsible for providing the drugs. Once they come back into the United States, that would be Soto and Perez, there's an important event, obviously, at the post office in Paris, California, on December 18, 2006. And this is the first time where we see Mr. Arias Garcia, who goes into the post office, not by himself, not empty-handed, but carrying a package, and in the company of, of all things, Mr. Soto. One of the people, who was one of the couriers, identified as having traveled to Mexico to pick up drugs. They go into the post office, Mr. Arias Garcia drops a package off. But did they both go in together? They go in together, he drops the package off, comes back outside of the post office. Now, subsequently... He comes up outside the post office, then what does he do? He walks over to, of all people, Mr. Utrera Jimenez, the person who is identified, and from whose computer these emails were obtained, who had been in contact with Perez and Soto in Mexico. He hands Utrera, he, Arias Garcia, hands Utrera Jimenez a slip of paper. He then, he then leaves the area. Agents then go into the post office and search a box that closely resembles, I can't say it's the same one, but closely resembles a box seen being carried by Mr. Arias Garcia into the post office, and inside, of course, are heroin and cocaine. Now, what do we do about the fact that the jury acquitted Mr. Arias Garcia on the count relating to the post office incident? See, I don't think that you can draw that conclusion. The defendant was charged in two counts. Conspiracy to possess with intent to distribute and to distribute heroin and cocaine. Count one, he was found not guilty. He was convicted of count two, conspiracy to import heroin and cocaine. The overt acts that are alleged in support of count one are the exact same overt acts alleged in support of count two. First of all, I think it's difficult and perhaps unwise to try and conclude why a jury convicted a defendant on one count of indictment and found him not guilty on another count. I think it is fair, if you want to go down that road, to suggest that this case clearly, in terms of the evidence presented, was about an importation case. It was a case involving international shipment of drugs, and so it may very well have been that the jury was focused upon that aspect of it, and particularly the aspect about the challenged emails. In fact, it was Arias Garcia who sort of stepped into the role, if you will, in April of 2007, and Mr. Perez. Once again, and before we get to those emails, the other evidence of the conspiracy, of course, is that on May 3rd of 2007, there are border crossing records that indicate Mr. Arias Garcia returning to the United States approximately one hour either before or after, of all people, Mr. Soto. And again, that border crossing occurs just a few days after the challenged emails. With that background and in that context, the government contends that Judge Klausner was- I'd like to see your diagram. Your Honor, if I had known- You know, the last conspiracy case, which was a huge one, that I sat as a district judge on, and I let the evidence in, and the government agreed they'd tie it up, which I didn't think was such a great idea, but I said, okay, fine. They couldn't tie it up. They couldn't tie it up. The whole thing collapsed. Maybe it was the diagram. What? Maybe it was the diagram. No, no, it was the way the case was presented. It really was. And it was- So, you know, you talk about this, you talk about that. Judge Trott, you know who he is? I know Judge Trott quite well. He was a prosecutor. He diagrammed every case so you could see what was happening. You've got a scattering here, a scattering- Something happens here, you know, the jury acquits here. You know, it's just like a- You know, you're supposed to have a nice, tight little scheme, you know. I understand. That's probably why the jury acquitted on the other one. I don't know. Right. You know. We don't know why the jury acquitted on it, but the- We don't know why, but something made them uneasy. The other report I wanted to- So the guy went in, and he had a box, and before he went in the post office, he was with one of the people that you were- had under surveillance and believed was involved in this drug operation. He went in, he deposited the box somewhere. Did anyone see him deposit the box? They saw him go into the post office with a box in his possession. And they saw him come out. Come out of the box. So they're not sure what they did with him, what happened to the box. Correct. And then they see him give a note to another party out there, and then he's gone, right? He leaves. He leaves. He leaves at that point, correct. He leaves at that point. There was no one there to follow him to- There was surveillance there, wasn't there, at the post office? There was surveillance. They went other places. So who were they surveilling then? Well, Utrera Jimenez, the person who was handed the note. But what's important- You have the note? But what's important- I'm sorry? You have the note? No. What happened to the note? By the time they- nobody was arrested in December on that day. Okay. You were just waiting for them. Well, they obtained a search warrant, opened the box. As I said, it resembled the box that the defendant carried in. And lo and behold, heroin and cocaine. Were there fingerprints on the box? No. No. No. There's one other case that was- I want to mention- Where was the box- where was it being sent to? It was being sent to an address on the East Coast, an address that was provided by Dinosorio, the person who was on the southern end of the conspiracy. And Utrera Jimenez- Was this being sent by U.S. mail? Yes, or Federal Express or- So there was a Federal Express box. It was- I think it was just being sent by U.S. As I recall now, just a U.S. mail parcel post type package or whatever. I don't remember specifically. The one other case I wanted to- I thought it was UPS. I don't think it was. I'd have to look. There's one other case, and I wanted to bring this to the attention of Ms. Fusilier, but I wasn't able to see her before we began today, is that Thursday of last week, the circuit decided a case entitled United States v. Lamar Webster. The case number is 09-30173. And I would invite the court's attention to it because- You have to leave a slip over here. I'm sorry? You have to leave a gum slip for the clerk. All right, I'll do that. We don't take notes. No, I understand. Yeah, you just put it over there. I'll do that. I just wanted to bring the court's attention to the case. And you're opposing counsel, of course. Yes, I know. And I tried to do it today, but I didn't see her before we began. Thank you very much. Unless the court has any questions. Okay. Just to rebut slightly, the government cannot hypothecate as to the basis of the jury's not guilty verdict. There was one eyewitness that was the surveillance at the postal annex in December of 2006. It was Officer Machado of the Pomona Police Department. On cross-examination, he said that he was observing about four males, he was observing the four males equally in time over a 40-second period. He indicated that the person who he believed might have been Mr. Uris-Garcia, he observed for 10 seconds. He admitted that he was about 40 yards away and there were trees, and he was having to look out of his front car window slightly over beyond 40 yards. The jury obviously discounted that identification. He wasn't in the post office. Pardon me? He was not inside the building. No, he was 40 yards away in a car. In a car. In a parking lot with trees outside of this postal annex. It was not a U.S. postal office. It was not a postal office. It was a postal annex, which will receive packages to mail either through the U.S. Postal Service. This was a private business, was it? Yes. The postal annex, you know, we've got a big postal annex downtown at the foot of Olvera Street. It's a huge building. According to the testimony in the transcript, it appears as though it was not a main postal annex of the U.S. Postal Service. My father was a postman, so I know all about the post office. There used to be that large postal annex in downtown Los Angeles. Through all of their court-ordered wiretaps, not once did they ever hear Iris Garcia included in any phone calls himself, nor did they ever hear his name mentioned in any phone calls. At the home of Dinosaurius, they said over the entirety of their surveillance of that home, they saw Busoa Soto, Utrera, many, many other people. Never Iris Garcia was there. And it should be noticed that Mr. Iris Garcia had grown up in Mexico, in Ensenada, with Busoa Soto. So consistent with the cases, someone who even approves of criminal conduct, unless there is some overarching evidence to indicate there was an agreement by him to participate in this conspiracy to import, it seems clear that Count One excluded the fact that he was at that postal annex in December of 06. It seems clear that they did not. How was your client located? Pardon me, Your Honor? How was your client located? Well, he was in San Diego, and I believe that he was arrested when he was traveling back with Mr. Busoa Soto. How did they know who he was? Well, they had been following Busoa Soto and Utrera and Dinosaurius for months, at least from 2006 until sometime in August of 07. And this occurred in April of 07. So we believe... So your client was in company with those folks? Yes, well, was in the company of one person who was bringing him back from Ensenada. There was testimony from another person, Perez, who indicated that apparently Mr. Aras Garcia was brought back to San Diego where he lived by a childhood friend, Busoa Soto. So Aras Garcia lived in San Diego? That's my understanding from the transcript. But you said he lives in Ensenada. He grew up in Ensenada when they were in grammar school and high school. They knew each other from the transcript since they were about 4 or 5 years old. And in the case that we cited, U.S. v. Miller, in our reply brief, there Ms. Jackson was in the company of Ms. Miller, who drove into Mexico on February the 10th, was observed with Ms. Jackson, who was a conspirator, who Ms. Jackson was observed with Ms. Miller, to go to a known drug distributor's home in Mexico. She drove back, went to a delivery drop, and this Court held that that was not sufficient evidence to establish that Ms. Jackson was a co-conspirator, merely because she accompanied a known co-conspirator or conspirator to Mexico. Who was that? That was the case of U.S. v. Miller, which is cited in our reply brief on page 5 for that proposition. And we would submit it. Thank you very much. Are there any additional questions? Tell me again, how do you tie in Orris? I'm sorry. How do you tie in Orris? Tie in Orris Garcia? Yeah. Oh, because you have the virtually identical e-mails. Now we're talking about the e-mails being admitted, I'm assuming by the tenor of that question. No, I'm just asking you what the evidence is that ties him into a conspiracy. It's what you have to do, right? Which I have to do, which we believe we did, and that is when you examine the e-mails that were transmitted in 07, and then a few days later he's seen crossing back into the United States an hour before or an hour after it was suicided. But what does that mean? What does that mean? Well, because the e-mails. Thousands of people. Well, but in the context of the whole case, we know that in December of 2006, Euteri Menas sent e-mails to Dinosaurio in which he indicated that these two people would be coming down to pick up drugs. One of those people was Bazua Soto. The other person was Perez, admittedly not Orris Garcia. We know that, in fact, drugs were brought into the United States because the drugs were found on December 18, 2006, at the Harris Post Office. We know that because we have Orris Garcia and Soto going into the post office carrying this bag, Orris Garcia carrying the bag. A very similar bag is recovered. I thought it was a box. I'm sorry? A box. A box. A box. Similar boxes, search warrants obtained, heroin and cocaine were removed from the box. Were any fingerprints found on the box? No. None whatsoever? No. Because they weren't gloves when he went in the box. No. Sometimes materials, it's handled by other people, it could be smugglers. But it was grabbed right away. It was obtained shortly thereafter. That's true. We then know that a few months later, April of 2007, again, transmissions from Euteri Menas to Dinosaurio, virtually identical e-mails. Again, the same person, Bazua Soto, but now instead of Perez, of all the people, Orris Garcia, the person who the officer identified as being at the post office in December 2006. I mean, that's the state of the evidence in between. But he saw him for 10 seconds. I'm sorry? Saw him for 10 seconds. That's what I heard. I'm sorry? The officer saw Perez in the post office. The officer made an observation. He also, which he didn't mention, was that he was shown a series of photographs and selected him out of a six-pack of photographs as the person who was the individual he saw walking into the post office. He then came to trial. How long after he saw him in the post office did he see the photo spread? It was December of 2006 that the incident occurred at the post office. Hang on just a moment. Hang on just a moment. It was he was shown photographs sometime after the grand jury returned the indictment, which was in October of 2007. So how long was that? So that would be approximately a year or something like that. A year. Yeah. Sees the guy for 10 seconds and he identifies him a year later. Then he's obviously asked if he recognizes the person in the courtroom, and he identifies him. And he's subject to cross-examination. And that evidence, along with the other evidence in the case, the jury made a determination, in fact, they believed that the government had proved beyond a reasonable doubt that the Arviz Garcia was, in fact, involved in the importation of heroin and cocaine as charged in count two of the indictment. Let me ask you this off the record. Off the record? Did he have any, well, I'm not going to ask that question. Please forget about it. It's all right. Thank you. Thank you. You know, I used to be with the VA when I was on Superior Court five days a week, and we had a lot of eyewitness identifications. And then about a year later I saw him at the LA Athletic Club. He didn't have the slightest idea who I was. May I just briefly clarify something as far as the six-pack? On page 91 through 97. As far as what's concerned? Regarding the show-up of the six-pack. On page 94. Six-pack. The six photos show up. Oh, well, you know, I thought you were talking about a six-pack of beer or something. On page 91 through 97 of the transcript of August 13th, 08, from the trial, Officer Machada indicated that 18 months later he was shown a photograph because Agent Schneider would periodically send him photographs. It was not a spread. Let me clarify. And he indicated that he said that he thinks that was the thin one. And, of course, the photograph was of a thin person. He also indicated that periodically, over this 18-month period, he was shown he had observed in surveillance many Hispanic males and he had received many photos. So I just wanted to clarify. Yeah, you've done that already. Let's start the trial. This isn't quick. What did you say? We're running out of time. That's all right. Go ahead. You want to say something? I just wanted to clarify that he was shown that Agent Schneider would send him photographs periodically over time. He never identified Aris Garcia until he finally saw a photograph of a person he believed to be Aris Garcia. Well, we have. Very interesting. Thanks. Thank you. All right. We'll go to the next matter. And this number, the next number is. . . Let me see. Which one is it? Oh, it's four. I don't know. Five, yeah. I don't see. What did you say? There it is. There it is. U.S. versus Lindsay.
judges: Pregerson, Nelson D. W., Ikuta